## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOHN DOE,

      Plaintiff,

v.                        Case No.  3:22-cv-414-MMH-LLL

PREDATOR CATCHERS, INC.
and ERIC SCHMUTTE,

      Defendants.

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 91; Motion), filed on January 19, 2024. Plaintiff John Doe filed a response in opposition to the Motion on February 22, 2024. See Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 105; Response). Although permitted to do so under the Local Rules of this Court, Defendants Predator Catchers, Inc. (PCI) and Eric Schmutte did not file a reply in support of their Motion and the time for doing so has passed. See Local Rule 3.01(d), United States District Court, Middle District of Florida (Local Rule(s)). Accordingly, this matter is ripe for review.

## I.   Background[1]

In the spring of 2022, John Doe had an active profile on the online dating application known as Tinder.   <u>See</u> Affidavit of John Doe (Doc. 106-1; Doe Aff.) ¶¶ 3, 5.   At the time, Doe was a thirty-eight-year-old man living in Atlantic Beach, Florida.   <u>See</u> Deposition of John Doe (Doc. 98; Doe Dep.) at 209. According to Doe, Tinder is a site for adults only and is "extremely clear about it being a forum for adults only."   <u>See</u> Doe Dep. at 140-41, 138.   On March 2, 2022, Doe "matched" on Tinder with a woman identified as "Jessie"—meaning that he liked Jessie's profile, and Jessie liked his.   <u>See</u> Doe Dep. at 44-45, 47. According to Doe, the age listed on Jessie's Tinder profile was nineteen.   <u>Id.</u> at 146.   And although Jessie's profile is not in the record, Doe recalls that her interests included "something about road trip [sic]."   <u>Id.</u> at 139.   Doe initiated a conversation with Jessie by sending her a message through Tinder's messaging platform at 11:09 p.m. on a Wednesday night.   <u>See</u> Doe Dep. at 129-30, Ex. F at 4.   Because the full context of Doe's exchange with Jessie is relevant to the claims in this case, the Court sets forth the entirety of the Tinder messages below.

---

[1] Unless otherwise noted, the facts recited here are undisputed. For the purposes of resolving the Motion for Summary Judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to the Plaintiff, John Doe. However, the Court notes that these facts may differ from those ultimately proved at trial. <u>See</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1190 (11th Cir. 2002).

The messages exchanged on Wednesday night are:

> Doe:      Hey
> Jessie:   Hey
> Doe:      Where was the last place you went on a road trip to?

<u>See</u> Doe Dep. at 129, Ex. F at 4.   The conversation continued Thursday

morning around 10:33 a.m.:

> Jessie:   Here haha I'm from Ohio
> Doe:      So did you move here, or are you just visiting?
> Jessie:   Just visiting
> Doe:      I'd be happy to help you create a very memorable experience while you're in town.
> Jessie:   How
> Doe:      I'm sure we can come up with something that will make you smile
> Jessie:   Like what
> Doe:      Something along the lines of multiple, consecutive, knee-weakening orgasms . . .
>           Interested?
> Jessie:   What's ur number

<u>See</u> <u>id.</u>, Ex. F at 4-5.   At this point, Doe provided his phone number to Jessie

and their conversation resumed at 12:42 p.m. via text message:

> Jessie:   Hey [Doe] it's Jessie from tinder
> Doe:      Hey
> Jessie:   Wyd
> Doe:      Not much. Working from home. You?
> Doe:      But, I'd be happy to shift my focus from work to you if you're interested?
> Jessie:   Send pic
> Doe:      [Sends picture]
> Doe:      Your turn
> Jessie:   How old r ya again
> Doe:      38
> Jessie:   So idk if you're guna Wana talk to me
> Doe:      Why is that?

Jessie:    I'm yunger than 18
Doe:    Ohh
    Are you interested otherwise?
Jessie:    Ya just didn't kno if u are
Doe:    How old are you?
Jessie:    13
Doe:    Doesn't your profile say you're over 18?? I feel like that's a detail I would have noticed
Jessie:    You can't put that you're 13 on there haha
Doe:    Oh, got it. That makes perfect sense. I really appreciate you being honest about your age before meeting up.

God knows I'm more than a little flattered that a beautiful young woman, like yourself, would be interested in me. Unfortunately, as much as it pains me to say, I'm going to have to pass on what sounds like it would have been an amazing time.

You're already gorgeous at your age, that I can't even begin to imagine the smoke show you're going to be when you're old enough to meet up!

Please feel free to save my number & give me a call in about 5 or 6 years. I'll probably be going through a mid-life crisis around that time so the timing will work out perfectly!
Jessie:    Ah ok
Doe:    The last paragraph was a joke . . .
Jessie:    Lol
Doe:    You do still owe me a pic though. I sent you one, so I think it's only fair that you send me one
Doe:    Are you staying out at the beaches?
Jessie:    [Sends picture[2]]
Jessie:    I'm in Atlantic beach area
Doe:    For how long?
Jessie:    Leaving Sunday
Doe:    Do other guys usually have an issue when you tell them how old you are?
Jessie:    Some do some don't
Doe:    Just out of curiosity, are you busy this afternoon?

---

[2] The picture is in the record as the first picture in Exhibit E to Doe's deposition. See Doe Dep. at 153-54, Ex. E.

| | |
|---|---|
| Jessie: | Nope |
| Doe: | I guess there's nothing wrong with us hanging out.   What time would you be able to get together? |
| Jessie: | Not sure yet |
| | What u tryna do |
| Doe: | Maybe smoke and hang out for a little |
| Jessie: | What else u got in mind |
| Doe: | What do you mean? |
| Doe: | Depends on how well we got along I guess |
| Jessie: | Just asking if there anything else in ur mind lol |
| Doe: | Possibly, but I think it would be better to meet before getting into it |
| Jessie: | Y loo |
| | Lol* |
| Doe: | I'm sure you can figure that one out |
| Jessie: | Um no lol |
| Doe: | Just prefer to tell you in person than by text, but if you don't want to get together we don't have to |
| Jessie: | Y u scared or something |
| Doe: | I prefer to think of it as being smart, but like I said-we don't have to get together if you've changed your mind |
| Jessie: | I didn't change my mind lol |
| | Wym smart? |
| | No one goes through my phone.   And I delete our messages anyway |
| Doe: | Just given the difference in age, I don't see any need to write a detailed account of everything I may be thinking about |
| Jessie: | Lol oook |
| Doe: | So – you want to meet up? |
| Jessie: | Ya |
| Doe: | What time will you be ready? |
| Jessie: | Maybe in like like 2 hrs |
| Doe: | Ok |

<u>See</u> Doe Dep. at 135-36, Ex. F at 6-20.   The conversation continues at 5:24 p.m.:

| | |
|---|---|
| Jessie: | What u Wana do? I'm honestly down for anything |
| Doe: | I live in Atlantic Beach.   Want to come smoke? |
| Jessie: | Idk I've never smoked b4 |
| Doe: | Then nevermind. Forgot I said that |
| | You just want to come over and not smoke? |

| | |
|---|---|
| Jessie: | What do u Wana do |
| Doe: | Go for a bike ride, go to the beach, Netflix – take your pick |
| Doe: | Maybe I'm going about this the wrong way. What would you like to do? |
| Jessie: | Netflix is always good |
| Doe: | What time? |
| Jessie: | When u say Netflix do u mean actually Netflix or Netflix and chill haha |
| Doe: | The second |
| Doe: | Which did you mean? |
| Jessie: | Down for either |
| | Surprised u want to. Didn't think u wanted to hook up with me |
| Doe: | What time are you going to be ready? |
| Jessie: | Prob in an hr |
| Doe: | How about 8 PM? |
| Jessie: | Ya |
| | Have u ever hooked up with someone my age |
| Doe: | Nope |
| | Why do you ask? |
| Jessie: | Jw |
| Doe: | Have you ever hooked up with someone my age? |
| Jessie: | Not in their 30s |
| | I've only had sex 4 times |
| | Haha |
| Doe: | Are you ready? |
| Jessie: | Not yet prob wait for my grandma go to sleep, is that ok? |
| | She goes to bed early |
| Doe: | Yeah, that's ok. |
| | Around what time do you think that will be? |
| Jessie: | Maybe an hr |
| Doe: | Ok |
| Jessie: | So ur wanting to like …u know , do it |
| Doe: | I have no expectations. Probably best to meet each other in person, before making a decision like that |
| Jessie: | I mean u said u wanted to Netflix and chill |

Id., Ex. F at 20-26   The conversation appears to have paused at this point and

then resumed at 10:56 p.m. as follows:

> Jessie:   Guess not [grinning face with sweat emoji]

| | |
|---|---|
| Doe: | What do you mean?   I thought you were going to let me know when you were ready? |
| Jessie: | U never texted me back lol |
| | Wyd |
| Doe: | Just finishing up a project I've been working on. |
| | What are you up to? |
| Jessie: | Just watching tv |
| Doe: | Is it too late to hang out tonight? |
| Jessie: | What u Wana do? |
| Doe: | Same plan, different time? |
| Jessie: | Netflix and chill? |
| Doe: | Sounds like a plan |
| Jessie: | My grandma is still awake for some reason lol |
| | How late u staying up |
| | I'm gonna shower.   Should I shave my legs lol |
| Doe: | That's up to you, but I think the majority of men, if asked, would always say "yes" |
| Jessie: | I mean if we hookin up I Wana shave sooooo lol |
| | If we not I won't shave haha |
| Doe: | I would say go for it, but if I don't hear back from you for over an hour I can't guarantee I'll still be awake |
| Jessie: | I understand haha |
| | U free tomorrow if not tonight |
| Doe: | I have plans for a friend's birthday tomorrow evening, but I'll still be up for a while tonight |
| Jessie: | What about Saturday? |
| Doe: | Sounds like you're not planning to come over tonight anymore? |
| Jessie: | U said u might not be up still |
| Doe: | If you took too long. How long do you need? |
| Jessie: | Haha my grandma got called into work, she a nurse. She said they begged her to come in |

Id., Ex. F at 26-30.   The conversation then continues on Friday at 11:14 a.m.

| | |
|---|---|
| Jessie: | Hey |
| Doe: | Hey |
| Jessie: | Wyd |
| Doe: | Working |
| Jessie: | Cool |
| Doe: | No, it's not. But it is necessary . . . at least for now |
| Jessie: | Ya lol |

<u>Id.</u>, Ex. F at 30-31.   At 11:03 p.m. that evening, Doe texts Jessie "What's up?"

and receives no response.   <u>Id.</u>, Ex. F at 31.   Doe texts her again at 1:32 a.m.

and the conversation resumes:

| | |
|---|---|
| Doe: | You still in Atlantic Beach? |
| Jessie: | Ya |
| | Leaving Sunday |
| Doe: | Cool – you able to get together now? |
| Jessie: | Really? |
| Doe: | Yes |
| Jessie: | What u Wana do |
| Doe: | Netflix |
| Jessie: | Idk it's Soo late lol |
| | U aren't free tomorrow night? |
| Doe: | Nope.   It's the perfect time! |
| | You have to wait for your grandmother to go to sleep anyways. |
| | She should be good and asleep by now. |
| | It'll be fun |
| Jessie: | What about in the morning |
| | And r we just wat hing movie because should I shower lol |
| | Watching movie* |
| Doe: | You can come just like you are right now |
| Jessie: | My grandma is working actually lol |
| Doe: | Perfect. How soon can you be ready? |
| Jessie: | U Wana just chill here? She won't be back until 6:30 |
| Doe: | I'd rather come back to my house, so there's no chance of someone coming home early |
| Jessie: | She won't. She always texts me when she's leaving work. Lol no one else lives here |
| | I also have tv in my room so if she did come home you could just climb out the window lol |
| Doe: | Are you not willing to come here? I don't live far away & you wouldn't have to climb out any windows |
| | I also think there will be more fun things to do over here |
| Jessie: | Like what |
| Doe: | You'll have to see for yourself |
| Jessie: | Dude just tell me lol |

| | |
|---|---|
| Doe: | I honestly don't know. I was just trying to convince you to come here. |
| | I would be much more comfortable if we can hang out at my place, but if you don't want to come over then I'm not going to keep pressuring you to come here |
| Jessie: | I'm just a little nervous just jumping In ur car right away. Can u come in and talk for just a sec so I know u aren't crazy killer lol |
| | Gotcha |
| | Wow that's wack |
| Doe: | What is? |
| | Yeah I can talk for a minute or however long it takes you to figure out that I'm not a crazy killer |
| Jessie: | Ok let me get up and get ready real quick. |
| Doe: | Ok, how long until you're ready? |
| Jessie: | 10 min |
| | 1340 Roxie st |
| Doe: | That's a bit further away than I thought |
| Jessie: | How far |
| Doe: | 10-15 minutes |
| Jessie: | Bruh that ain't far at all haha |
| Doe: | Can you FaceTime real quick before I drive out there |
| Jessie: | [Sends picture[3]] |
| | How far r u |
| Doe: | Just leaving. I meant a more revealing pic |
| Jessie: | [Sends picture[4]] |
| | How's this lol |
| | R u like close lol |
| Doe: | Yeah |
| Jessie: | Y it feel like u [expletive] with me |
| Doe: | Think I'm here |

See Doe Dep., Ex. F at 31-42.

---

[3] This picture is the third picture in Exhibit E to Doe's deposition.  See Doe Dep. at 204-05, Ex. E.

[4] This picture is the second picture in Exhibit E to Doe's deposition.  See Doe Dep. at 207, Ex. E.

Unbeknownst to Doe, Jessie was a decoy profile and the individual communicating with Doe as Jessie was actually Eric Schmutte, a man in his mid-thirties who is the president and founder of PCI.   See Deposition of Eric Schmutte (Doc. 94; Schmutte Dep.) at 27-28, 30, 34, 49, 65; see also Deposition of Samantha Syrus (Doc. 95; Syrus Dep.) at 25.   PCI is a non-profit corporation whose mission is to find and "help expose online predators . . . trying to meet children."   See Schmutte Dep. at 28, 34; see also Syrus Dep. at 21.   Generally, PCI operates by creating "decoy" profiles on social media websites or online dating platforms.   See Schmutte Dep. at 27.   PCI is funded through donations. Id. at 38.

Here, Schmutte created the "Jessie" profile.   Id. at 49.   The profile identified Jessie as being over the age of eighteen because Tinder will not allow a user to create a profile younger than eighteen.   See id. at 64, 102, 117.   The pictures of Jessie are actually pictures of a person named Alexis Thomas who has given PCI permission to use her photograph in decoy profiles.   See id. at 24, 27-28, 30-31, 49, 52-54; see also Predator Catchers, Inc.'s Answers to Pl.'s First Interrog. (Doc. 106-2), No. 10.   Thomas was over the age of eighteen when PCI first started using her photograph for decoy profiles, and twenty at the time

Schmutte was conversing with Doe, but Thomas's age in the pictures themselves is unclear on the current record.   See Schmutte Dep. at 24, 52-54.[5]

According to Doe, when he asked Jessie to FaceTime with him, he received a picture and a phone call instead.   See Doe Dep. at 55; Doe Aff. ¶ 10. He explains that, "[he] spoke with a woman who claimed to be 'Jessie' and who was clearly over the age of eighteen (18)."   See Doe Aff. ¶ 10.   Doe recounts that "[t]he woman with whom [he] spoke encouraged and pressured [him] to go to the home where she was supposedly staying with her grandmother."   See id. The person on the phone was actually Samantha Syrus, a thirty-year old woman who volunteers with PCI.   See Syrus Dep. at 5, 18, 42-43.

Doe arrived at the house where Jessie was purportedly staying at around four o'clock in the morning.   The three PCI members present at the house recorded their encounter with Doe and Doe filed those recordings with the Court.   See Plaintiffs' Notice of Filing (Doc. 104).   The following facts are based on the Court's review of the four videos in the record.   When Doe arrives, he is greeted at the door by Syrus who is playing the role of "Jessie," and they

---

[5] In the Response, Doe asserts that Thomas "was over the age of 18 when each of the photographs were taken" and cites to Schmutte's Deposition testimony at pages fifty-two through fifty-four.   See Response at 8.   The Court has reviewed the cited testimony and it does not support this contention.   Doe's counsel asks Schmutte how old Thomas was at the time Schmutte posed as a decoy for the operation involving Doe (around 20), and he asks if Thomas was over the age of eighteen when PCI started using her photographs (yes).   See Schmutte Dep. at 53-54.   But Thomas's age at the time the photographs were taken is not addressed.

sit down on the couch.   See Schmutte Dep. at 78-79.   Less than a minute after his arrival, Doe is confronted by PCI member Brooklyn Beeman who briefly pretends to be Jessie's grandmother before dropping the affectation altogether. See Deposition of Brooklyn Beeman (Doc. 96; Beeman Dep.) at 38-39. Schmutte enters the room soon thereafter.   Schmutte and Beeman interrogate Doe about "Jessie's" age and accuse him of soliciting a minor.   Doe and Schmutte stand at the front door arguing for a few minutes about Jessie's age and the meaning of "Netflix and chill."   Eventually, Doe opens the door to leave. Doe is inside the house for less than five minutes.

Schmutte makes no attempt to physically stop Doe from opening the door but follows Doe outside, walking closely behind him while mocking and insulting Doe.   Schmutte escalates his tone and language, shouting expletives at Doe.   Beeman or Syrus can be heard in the background yelling insults and accusations at Doe as well.   At one point, Schmutte adopts a calmer demeanor, referring to Doe as "dude" and "sir," and asks Doe if he thinks it is acceptable for a guy in his thirties to meet a thirteen-year-old girl.   Doe responds that she was on a dating website for adults.   As Doe drives away, Schmutte shouts insults and expletives at him again.

At no point in the encounter does Schmutte, Syrus, or Beeman verbally threaten to strike Doe.   Schmutte does not raise his hand or fist to Doe, nor does he make any sudden movements suggesting he is about to hit, shove, or

otherwise physically attack Doe.   Indeed, Schmutte is recording the confrontation such that throughout the entire encounter he is steadily holding a raised cellphone in his right hand.   Nevertheless, when Schmutte is shouting at Doe he is standing so close to Doe that Doe can feel Schmutte's spit hitting his face.   See Doe Dep. at 110, 118.   In his Affidavit, Doe states that during this encounter he "felt trapped and thought [Schmutte] may hit me . . . ."   See Doe Aff. ¶ 11.   After Doe leaves, Schmutte states on the video that he "wanted to punch [Doe] so bad."   The PCI members also discuss Doe's apparent fear during the encounter.   The entire confrontation, from Doe's arrival at the house until he drives away, lasts less than seven minutes.

Significantly, PCI broadcasted the encounter with Doe via a livestream on the PCI YouTube channels and Facebook pages.   See Schmutte Dep. at 77-78.   On the video, Schmutte, Syrus and Beeman read and respond to comments posted by people following the livestream and periodically thank people for making donations to PCI.   After Doe leaves, Schmutte, Syrus, and Beeman continue the livestream by discussing their interactions with Doe and responding to viewer comments.   Schmutte observes that Doe was "really careful in the chats," called him a "beat around the bush type of predator," and expressed his view that "unfortunately, a guy like that, if the cops got involved, he wouldn't . . . get charged, just 'cause of the chats, how the chats were, he was too cautious."   Schmutte then reads aloud the messages exchanged between

Doe and Jessie, adding his commentary throughout. Notably, Schmutte expresses his opinion that Doe would not be charged and convicted for this conduct based on the term "Netflix and chill," although "we all know" what it means. On the recordings, the PCI members refer to Doe as a "cho-mo"[6] and a predator. One likens him to Jeffrey Epstein, and another states that he was "creepy as hell" with "serial killer vibes." During the recording, one of the PCI members holds up a phone displaying Doe's LinkedIn account showing his full name and photograph.

PCI posted the videos on its YouTube channels and Facebook pages, and posted a shorter clip on Instagram. See Predator Catchers, Inc.'s Answers to Pl.'s First Interrog. (Doc. 106-2) No. 15; see also Schmutte Dep. at 75-76. The record contains a screenshot of a post on a PCI Facebook page that identifies Doe by name and location and remains accessible on PCI's Facebook page. See Doe Dep., Ex. G (the Facebook Post); Doe Aff. ¶ 13, Ex. C. The Facebook Post states that Doe, "38 of Atlantic Beach, FL came to meet whom he believed to be a 13 yo child at 4am. He came to 'Netflix and Chill' and also asked for a suggestive photo from the child before meeting." See Doe Dep. at 209-11, Ex. G. On the Facebook Post, PCI includes a Wikipedia definition for "Netflix and Chill" as follows:

---

[6] It is the Court's understanding that the slang term "cho-mo" is an abbreviation for child molester.

> an Internet slang term used as a euphemism for sexual activity, either as part of a romantic partnership, as casual sex, or as a groupie invitation.  Since its first recorded, nonsexual use in a tweet posted in 2009, . . . the phrase has gained popularity within the Twitter community and other social media sites like Facebook and Vine.  By 2015, "Netflix and chill" had become an Internet meme and its use on teenage social media was commonly described as "sexual."

Id.

On March 10, 2022, Schmutte and Doe exchanged text messages.  See Doe Aff. ¶ 12, Ex. B.  Schmutte told Doe that he was uploading the video to multiple social media websites and informed Doe that "getting videos taken down only makes us uploaded [sic] it to more platforms now."  Id., Ex. B.  Doe responded that he had retained counsel to initiate a lawsuit against Schmutte and PCI.  Id., Ex. B.  Around this same time, Doe filed a complaint against PCI and Schmutte with the Jacksonville Sheriff's Office.  See Doe Dep. at 68-70.

Doe presents evidence that friends and family members have seen PCI's video of the encounter.  In his deposition, Doe explains that a "friend of a friend" posted about the incident online, that Doe's friend saw the post and commented on it, and they "tagged every other friend that we had in common . . . ."  See Doe Dep. at 76-77.  Doe also testifies that several people have sent him links to "the form or something posted on [PCI's] Facebook page" and asked him if he was aware of it.  Id. at 78.  And he identifies two friends who have

cut off communication with him.   Id. at 90-91.   Doe also states that his brother refused to allow contact between Doe and his niece and nephew beginning "a week or two following the incident" in March of 2022, until "a few months" before his December 29, 2023 deposition.   See id. at 88-89.   In his Affidavit, Doe states that he has "anxiety that people will continue to send me links to the Facebook post and that anyone I try to get close to or date will not trust me, or it will at least be in the back of their mind."   See Doe Aff. ¶ 14.   Indeed, Doe states that "[i]f anyone Google's [sic] my name, they still see the Defendants' Facebook post about me," and he attaches the Google search results for his name that "prominently shows the post and claims about the encounter . . . ." See Doe Aff. ¶ 13, Ex. C.   Doe also asserts that "[f]rom the comments on the social media posts, and from seeing news stories and tropes from TV shows or movies, I am fearful my safety is at risk due to people having the wrong idea about me."   Id.

On April 12, 2022, Doe initiated this action against Schmutte and PCI. See Complaint (Doc. 1; Original Complaint).   The operative pleading at this time is the Amended Complaint (Doc. 69), filed July 14, 2023.   In the Amended Complaint, Doe sets out five counts identifying the following claims: 1) Defamation, 2) Invasion of Privacy, 3) Intentional Infliction of Emotional Distress (IIED), 4) Assault, and 5) Civil Remedy for Cyber Crimes.   In the instant Motion, Defendants seek summary judgment in their favor on all claims

pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)).   Defendants also assert that the Court lacks subject matter jurisdiction over this action. For the reasons that follow, the Court finds that the Motion is due to be granted, in part, and denied, in part.

## II.   Subject Matter Jurisdiction

In the Motion, Defendants assert that the Court lacks subject matter jurisdiction over this action and seek summary judgment on this basis.   See Motion at 13-17.[7]   Specifically, Defendants maintain that Doe fails to present evidence sufficient to meet the $75,000 amount in controversy threshold as necessary to invoke this Court's diversity jurisdiction under 28 U.S.C. § 1332(a). See id. at 15-17.   Defendants contend that "Plaintiff has failed to provide any evidence of compensatory damages, has failed to disclose through mandatory disclosures what his damages are, and has failed to provide clear and convincing evidence to support an award for punitive damages."   Id. at 17. Doe does not directly respond to this argument in the Response.   Nevertheless,

---

[7]   Defendants' request for summary judgment based on a lack of subject matter jurisdiction is procedurally improper.   "[S]ummary judgment pursuant to Rule 56 is not the correct procedure for dismissing based on lack of subject matter jurisdiction because 'a grant of summary judgment is a decision on the merits . . . [but] a court must dismiss a case without ever reaching the merits if it concludes that it has no jurisdiction.'"   See Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001) (second and third alterations in original) (quoting Capitol Leasing Co. v. Fed. Deposit Ins. Corp., 999 F.2d 188, 191 (7th Cir. 1993)).   If the Court lacks subject matter jurisdiction, then the Court must dismiss the action without prejudice.   See Stalley ex rel. U.S. v. Orlando Regional Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) ("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice.").

Doe does summarize the evidence of his damages and briefly discusses the types of damages that are available in defamation actions.   <u>See</u> Response at 15-16, 22-23.

Significantly, this is the second time Defendants have challenged the amount in controversy in this action.   Defendants previously filed a motion to dismiss the Original Complaint in which they raised a lack of subject matter jurisdiction, among other arguments.   <u>See</u> Defendants' Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for a More Definite Statement (Doc. 42; Motion to Dismiss).   On June 21, 2023, the Court entered an Order finding that Doe had failed to meet his burden to show that the amount in controversy threshold was met and granting Defendants' motion to dismiss on that basis. <u>See</u> Order (Doc. 64) at 11-12.   Notably, the Court found inadequate support for damages in excess of $75,000 in part because Doe had failed to either allege or, when challenged, present any evidence that "Defendants or anyone else identified him online in the recording, photograph, internet posts, or comments," or that he "believes someone has otherwise connected him to the incident."   <u>See</u> Order at 10.   Ultimately, the Court dismissed Doe's claims without prejudice but provided him with the opportunity to file an amended complaint, which he did, and that Amended Complaint is the operative pleading at this time.   <u>See id.</u>   The Court presumes the reader's familiarity with the June 21, 2023 Order and the legal principles set forth there.

## A. Applicable Law

"The party seeking to invoke federal diversity jurisdiction under 28 U.S.C. § 1332 must prove that the claim meets the threshold jurisdictional amount of $75,000 by a preponderance of the evidence." See Wineberger v. RaceTrac Petro., Inc., 672 F. App'x 914, 917 (11th Cir. 2016).[8]  In determining whether the amount in controversy requirement is met, courts may make reasonable deductions and inferences, and may rely on "'judicial experience and common sense.'"  Id. at 917 (quoting Roe v. Michelin N. Am., Inc., 613 F.3d 1058, 1061-62 (11th Cir. 2010)).  Moreover, the amount in controversy is not "a prediction of 'how much the plaintiffs are ultimately likely to recover,'" but rather "an estimate of how much will be put at issue during the litigation . . . ." See S. Fla. Wellness, Inc. v. Allstate Ins. Co., 745 F.3d 1312, 1315 (11th Cir. 2014); McDaniel v. Fifth Third Bank, 568 F. App'x 729, 730 (11th Cir. 2014) ("When determining whether the amount in controversy requirement has been met, district courts should only consider the amount the plaintiff has placed in controversy, not the amount the plaintiff is likely to recover.").[9]

---

[8] In the June 21, 2023 Order, the Court found that the "legal certainty" test does not apply because Doe sought indeterminate damages in the original Complaint (Doc. 1).  See Order at 5-9.  In the Response, Doe makes no effort to argue that the Court should apply the legal certainty test at this time and as such, the Court will not revisit that determination.

[9] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point.  See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Although Doe asserts several causes of action, both parties focus their damages analysis on Doe's defamation claim so the Court will do the same. "Florida law recognizes two categories of compensatory damages for defamation: general and special." Grayson v. No Labels, Inc., 601 F. Supp. 3d 1251, 1256 (M.D. Fla. 2022).[10] Special damages are "actual, out of pocket losses; that is, realized or liquidated loss." Id. at 1257 (citing Daniels v. HSN, Inc., No. 8:18-cv-3088, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020)). Special damages are not at issue in this case.[11] See Doe Dep., Ex. H: Pl.'s Unverified Resp. to Defs.' First Set of Interrog.; see also Doe Dep., Ex. I: Pl.'s Resp. to Defs.' First Req. for Produc. To Pl.

Aside from special damages, Florida law also permits an award of "general damages to the victim of defamation to compensate him for the reputational damage and emotional anguish caused by the defamation." See Sirer v. Aksoy, No. 21-cv-22280-BLOOM/Otazo-Reyes, 2023 WL 3166453, at *7

---

[10] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

[11] Although Florida law requires a plaintiff to plead and prove special damages when asserting a claim for defamation per quod, Doe asserts a claim of defamation per se. See Daniels v. HSN, Inc., No. 8:18-cv-3088-T-24 JSS, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020) (discussing difference between defamation per se and defamation per quod); see also Boyles v. Mid-Fla. Television Corp., 431 So. 2d 627, 633-35 (Fla. 5th DCA 1983) (discussing meaning of the term "innuendo" when distinguishing between defamation per se and defamation per quod).

(S.D. Fla. May 1, 2023).   "A plaintiff may recover such general damages 'even if there is no evidence that assigns an actual dollar value to the injury.'"   Id. (citation omitted).   Significantly,

> When it comes to general damages "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence."   "The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering."

Grayson, 601 F. Supp. 3d at 1256-57 (internal citations omitted) (quoting Army Aviation Heritage Found. & Museum, Inc. v. Buis, 504 F. Supp. 2d 1254, 1261 (N.D. Fla. Mar. 28, 2007)).

### B. Discussion

Here, Defendants contend that Doe fails to meet the amount in controversy requirement because he does not seek any special damages and his general damages, in Defendants' view, are simply not that severe.   See Motion at 15-17.   Defendants attempt to minimize Doe's evidence of reputational harm and emotional anguish by arguing that "only" two people known to Doe commented on the video and "only" six individuals sent the video to Doe privately.   Id. at 15-16.   Defendants assert that these people either were not close friends to Doe or have remained friends with him since.   Id.   And Defendants brush aside that Doe's brother refused to allow Doe to see his niece and nephew for over a year because Doe "has been permitted to see them in the

last few months." Id. at 16.   The Court wholly rejects these self-serving arguments.

Defendants have publicly identified Doe by name, location, and image, as a child predator.   Doe presents evidence that members of the community, including his friends and family, have seen the video PCI posted of the encounter.   And the evidence shows that the Facebook Post about him remains easily accessible online.   Thus, Doe reasonably fears that anyone new he meets will uncover the accusation simply by searching his name on the internet.   If Doe prevails on his claim that this accusation is false and defamatory, judicial experience and common-sense dictate that even absent special damages, the general damages stemming from such conduct could easily exceed $75,000. See Coton v. Televised Visual X-Ography, Inc., 740 F. Supp. 2d 1299, 1314 (M.D. Fla. 2010); see also Sirer, 2023 WL 3166453, at *7-8.   The amount in controversy requirement is satisfied.   The Court has subject matter jurisdiction over this action.   Thus, the Court tuns to the merits of the Motion.

## III.   Summary Judgment

### A. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for

summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[12] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark,

---

[12]  Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## B. Discussion

### 1. Defamation

To prevail on his defamation claim under Florida law, Doe must establish these five elements: "(1) publication; (2) falsity; (3) the statement was made

with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." See Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008)).   In the Motion, Defendants raise two arguments in support of their request for summary judgment on this claim. First, Defendants contend that Doe fails to specifically identify any defamatory statements.   See Motion at 18.   Second, Defendants appear to argue that Doe lacks evidence to support the third element of a defamation claim concerning fault.   Id.

The Court considers first Defendants' argument that summary judgment is warranted because Doe fails to specifically identify any defamatory statements.   Doe does not appear to directly respond to this argument in his Response.   Significantly, as to the videos, Doe makes no effort to identify any specific statements on the recordings that he contends are defamatory, nor does he argue that it is the depiction of him in the video as a whole that is defamatory.   See Response at 17-21.   It is not the Court's burden to make arguments on Doe's behalf or search the record and consider every statement which Doe may or may not contend constitutes actionable defamation.   See Schiller v. Viacom, Inc., No. 1:15-cv-22129-UU, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016).   As such, the statements in the recordings will not be

considered.   Id.   Nevertheless, Doe does assert that posting this video and his image on PCI's social media sites "improperly associates him with sexual predators."   See Response at 20; see also Predator Catchers, Inc.'s Answers to Pl.'s First Interrog., No. 15 (identifying PCI social media pages where video posted).   Absent any argument from Defendants to the contrary, the Court is satisfied that this juxtaposition—posting Doe's image on websites identifying child predators—may convey to an ordinary viewer that Doe is a child predator and constitute a defamatory statement.   See Brown v. Tallahassee Democrat, Inc., 440 So. 2d 588, 590 (Fla. 1st DCA 1983); see also Miami Herald Pub. Co. v. Brown, 66 So. 2d 679, 679-81 (Fla. 1953).

In addition, Doe specifically identifies the text of the Facebook Post as defamatory.   See Response at 17, 18, 21; see also Doe Dep., Ex. G.   The substance of the Facebook Post is shown here:



See Doe Dep., Ex. G.   Doe contends the statement that he "came to meet whom he believed to be a 13 yo child at 4am" is false because he did not believe that "Jessie" was thirteen years old.   See Response at 21; see also Doe Aff. ¶¶ 8-10; Doe Dep. at 209-10.   Doe also argues PCI's assertion that he "asked for a suggestive photo from the child before meeting" is false because he "did not ask for a suggestive photo, did not believe he was communicating with a child, and

in fact was not communicating with a child." <u>See</u> Response at 21; Doe Dep. at 210-11.   And more globally, Doe contends that the depiction of him in this Post as a predator who intended to meet a child to engage in sexual contact is false. Significantly, Defendants do not raise any argument that the statements in this Post constitute non-actionable opinion or are otherwise not defamatory.   And plainly, whether they are false is an issue of fact that turns on Doe's credibility and cannot be resolved at this stage of the proceedings.   As such, to the extent Defendants seek summary judgment on Doe's defamation claim based on a failure to specifically identify any defamatory statements, this argument fails.

Assuming Doe is not a child predator, as the Court must at this stage in the proceedings, the Court turns next to Defendants' argument concerning fault.   <u>See</u> Motion at 18.   As recited above, to state a claim for defamation, a plaintiff must establish, among other things, that the actor acted "with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person . . . ." <u>See</u> <u>Johnston v. Borders</u>, 36 F.4th 1254, 1275 (11th Cir. 2022).   This is the "fault" element of a defamation claim.   <u>See</u> <u>Log Creek, L.L.C. v. Kessler</u>, 717 F. Supp. 2d 1239, 1247 (N.D. Fla. 2010); <u>see also</u> <u>Porter v. Sanchez</u>, No. 6:16-cv-1379-Orl-37DCI, 2017 WL 5157898, at *3 (M.D. Fla. Nov. 7, 2017).   The entirety of Defendants' argument on this point is as follows:

> Furthermore, element number three of defamation requires known falsity or reckless disregard as to the falsity by Defendants, and Plaintiff admits that he could see how some of his messages—or omissions—during his text conversation with Jessie could seem like he was being purposefully sexual with someone whom he believed to be 13 years of age.

<u>See</u> Response at 18 (internal record citations omitted). This undeveloped and conclusory argument misses the mark. Doe is undoubtedly a private person, not a public figure. <u>See</u> <u>Porter</u>, 2017 WL 5157898, at *3. As such, he is not required to establish Defendants' knowledge or reckless disregard as to the falsity of the statements. <u>Id.</u> At most, Doe need only show that Defendants acted negligently. <u>Id.</u>

Upon review of the record, the Court is satisfied that, if the jury finds Doe credible, there is evidence from which a jury could find that Defendants acted negligently. For example, Defendants knew that Doe had found Jessie's profile on an adult dating website, and Defendants knew that prior to arriving at the house, the person Doe spoke to on the phone posing as Jessie was a thirty-year-old woman. The same thirty-year old woman greeted Doe at the door. And the jury may also agree with Doe that the person in the pictures of Jessie that Defendants sent to Doe is "clearly" over the age of eighteen. <u>See</u> Doe Dep. at 54, Ex. E. Defendants also knew that Doe had not been charged with any crime and indeed, Schmutte expressed his view that Doe would not be charged or convicted for his actions given the ambiguity in the text messages. The Court

expresses no view on whether these facts will persuade the jury or whether Doe will ultimately prevail.   But on this record, and absent any argument to the contrary, whether Defendants acted negligently in publicly identifying Doe as a child predator is an issue of fact for the jury to determine.   Defendants' request for summary judgment as to the defamation claim is denied.

### 2. Invasion of Privacy

In Count II of the Amended Complaint, Doe asserts a claim for invasion of privacy.   Significantly,

> Florida recognizes three categories of privacy torts: "(1) appropriation—the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion—physically or electronically intruding into one's private quarters; [and] (3) public disclosure of private facts—the dissemination of truthful private information which a reasonable person would find objectionable."

See Oppenheim v. I.C. Sys., Inc., 695 F. Supp. 2d 1303, 1308 (M.D. Fla. 2010) (quoting Allstate Ins. Co. v. Ginsberg, 863 So. 2d 156, 162 (Fla. 2003)).   In the Motion, Defendants interpret Doe's claim as one based on public disclosure of private facts and seek summary judgment in their favor on that claim.   See Motion at 19-20.   In the Response, Doe asserts that his invasion of privacy claim encompasses all three versions of the tort and maintains that he has presented sufficient evidence as to each type of claim.   See Response at 23. Thus, as an initial matter, the Court must determine which forms of invasion of privacy are at issue here.

Upon careful review of the Amended Complaint, the Court finds that Count II raises only a claim of invasion of privacy by public disclosure of private facts.   This Count is titled simply "Invasion of Privacy" and, after the wholesale reincorporation of <u>all</u> previous factual allegations, includes one substantive allegation:

> As a result of the actions of Defendant Schmutte and Predator Catchers of establishing a Tinder profile of a fictional person named "Jessie" who used sexually suggestive comments to lure Plaintiff to a location where he was confronted and verbally assaulted by Defendants Schmutte and Predator Catchers, followed by the subsequent posting of the Recording and the Plaintiff's photograph and caption, followed yet again by Defendant Schmutte's initiating contact with Plaintiff and threatening to continue to post defamatory material constitutes an invasion of Plaintiff [sic] Plaintiff's privacy.

<u>See</u> Amended Complaint ¶ 49.   All that follows is an allegation that Doe was damaged by this invasion of privacy and a demand for judgment.   <u>Id.</u> ¶ 50. Significantly, there are no references to commercial appropriation within this Count, nor does Doe include any mention of an intrusion into Doe's private quarters in this Count.[13]   Even if some of Doe's general factual allegations in

---

[13] Notably, in their earlier Motion to Dismiss, Defendants argued, in pertinent part, that Doe had failed to specify which type of invasion of privacy claim he was asserting and expressed their understanding that his claim was one for public disclosure of private facts. <u>See</u> Motion to Dismiss at 15-16.   Remarkably, in response to the Motion to Dismiss, Doe noted the argument but did not assert that Defendants were wrong to view his invasion of privacy claim as solely based on public disclosure of private facts.   <u>See</u> Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for a More Definite Statement (Doc. 55) at 2, 6.   In fact, <u>nowhere</u> in his Response to the Motion to Dismiss did Doe assert that in Count II he raised all three forms of invasion of privacy.   Ultimately, the Court decided the Motion to Dismiss on subject matter jurisdiction grounds and thus, did not reach this issue.   <u>See</u> Order (Doc. 64).   But it is telling that in drafting the Amended

the background section of the Amended Complaint might be relevant to these theories of relief, such allegations are insufficient to give Defendants notice that Doe is asserting these additional claims, particularly given Doe's reincorporation of all facts into all Counts.  If Doe intended to assert appropriation or intrusion claims, he should have articulated that he was making those claims in the Amended Complaint and asserted them in separate counts.  See Palmer v. Albertson's LLC, 418 F. App'x 885, 889-90 (11th Cir. 2011).  Indeed, had the Court understood on its initial review of the Amended Complaint that Count II encompassed three separate theories of relief, the Court would have sua sponte struck the filing as an impermissible shotgun pleading.  See Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1321 n.10 & 1322-23 (11th Cir. 2015) (identifying one type of shotgun pleading as one "that commits the sin of not separating into a different count each cause of action or claim for relief" and noting a district court's obligation to "take the initiative to dismiss or strike the shotgun pleading" where a defendant fails to do so); see also Rothenberg v. United Parcel Serv., Inc., No. 3:23-cv-94-MMH-LLL, 2023 WL 7282887, at *2 n.4 (M.D. Fla. Nov. 3, 2023).  At this time, Doe

---

Complaint, Doe still made no effort to clarify that his invasion of privacy claim was premised on all three forms of the tort.  Indeed, Doe's claim in Count II of the Amended Complaint is virtually identical to Count II of the Original Complaint.  It is unclear whether this failure was due to sloppy drafting or gamesmanship, but either way, in the Amended Complaint Doe provides no notice to Defendants or the Court that he intends to raise invasion of privacy claims premised on appropriation or intrusion and he cannot assert those theories now.

cannot add new causes of action against Defendants in his response to their summary judgment motion.   See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule 15(a)]. A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.") (citation omitted)); see also Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1226-28 (11th Cir. 2013).   Thus, having determined that Doe has not asserted claims for appropriation and intrusion in the Amended Complaint, the Court will not consider them now.

The Court turns next to Defendants' contention that they are entitled to summary judgment on Doe's claim for public disclosure of private facts.   The elements of this tort under Florida law are: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern."   See Spilfogel v. Fox Broadcasting Co., 433 F. App'x 724, 725 (11th Cir. 2011).   The conduct at issue here appears to be Defendants' publication of the videorecording of the encounter at the house, which includes a segment where Schmutte reads the text messages exchanged between Doe and Jessie.   See Motion at 19 (citing Doe Dep. at 95); Response at 27.   In the Motion, Defendants argue that Doe's invasion of privacy claim fails because:

> Nowhere does [Doe] state Defendants have publicized private facts about him that are both offensive and not of public concern. Furthermore, Defendants' publication of Plaintiff's pursuit of a minor constitutes a matter of public concern.   Plaintiff has presented no record evidence in the alternative, thus defeating the fourth element of public disclosure of private facts and warranting the entry of summary judgment in favor of Defendants.

See Motion at 20.   Defendants cite no legal authority in support of this argument.   In the Response, Doe argues that publicizing both his private conversation with Jessie and the confrontation at the house is "highly offensive to a reasonable person . . . ."   See Response at 27.   As to whether it constitutes a matter of public concern, Doe maintains that the public's right to know does not extend to "vigilante-attempted sting operations."   Id.   Remarkably, Defendants declined to file a reply to respond to these arguments.

Upon review, the Court finds that Defendants' conclusory and undeveloped arguments as to this tort are inadequate to raise the matter for the Court's review.   Significantly, Defendants do not cite any authority to support their contention that the publication at issue here was not offensive, nor do they cite any authority addressing the law in Florida on what constitutes a matter of public concern.   Compounding the problem, Defendants made no attempt to reply to Doe's arguments on these points, essentially leaving Doe's contentions uncontroverted.   The Court will not craft arguments for Defendants nor conduct legal research on Defendants' behalf.   To the extent

Defendants seek summary judgment on Doe's invasion of privacy claim, the Motion will be denied.

### 3.  Intentional Infliction of Mental Distress

To state a cause of action for intentional infliction of emotional distress under Florida law, Doe must establish: "'(1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe.'"  See Colon v. Smith, No. 22-14106, 2024 WL 3898011, at *9 (11th Cir. Aug. 22, 2024) (quoting Hart v. United States, 894 F.2d 1539, 1548 (11th Cir. 1990)). Significantly, Defendants assert, and Doe does not dispute, that Doe's IIED claim must be premised on conduct independent from the defamation claim. See Motion at 20-21; Response at 28; see also Maletta v. Woodle, No. 2:20-cv-1004-JES-MRM, 2021 WL 1894023, at *5 (M.D. Fla. May 11, 2021) ("'Florida courts have held that the outrageous conduct supporting a claim for IIED must be separate from, or independent of, the alleged defamation.'" (quoting Porter, 2017 WL 5157898, at *4)).  According to Doe, his IIED claim satisfies this requirement because it is based on "the distress Defendants intentionally caused through the confrontation at the home itself, as well as subsequent text messages from Schmutte, threatening to further disseminate the video."  See Response at 28.

Nevertheless, Defendants contend that that they are entitled to summary judgment on Doe's IIED claim because Doe fails to present evidence of severe emotional distress.   See Motion at 20-21.   In support, Defendants assert that Doe "has not been suicidal, he has seen no medical professionals, he has taken no medication, he has not been forced to move or to get a new vehicle, and he has not felt compelled to get a security system."   See Motion at 21; see also Doe Dep. at 12, 25, 83-84, 94.   In the Response, Doe maintains that "[a]ll elements of this tort are sufficiently established in this Response."   See Response at 28. In support, Doe argues that he

> felt tremendous shock and fear by realizing he was set up, that he was being filmed, that his reputation would forever be tarnished, and that his physical safety may forever be at risk by these false accusations.   [Doe] also felt tremendous shock and fear for his physical safety by Defendants' words, movements, size, demeanor, feeling ganged up on, and feeling trapped in the home.

See id.   Although he does not cite to any evidence in this section of the brief, in the background section, Doe asserts that he was damaged by the "approximately 7 minutes of the actual Encounter itself, even without publication" and cites portions of his deposition testimony and his Affidavit in support.   See Response at 16.   The Court has reviewed this evidence and in it, Doe describes Schmutte's aggressive behavior, states that he was "kind of thrown for a loop when all this happened," explains that he "wanted to get out of there, someplace I felt safe," and asserts that he felt threatened with physical

harm.  <u>See</u> Doe Dep. at 26-27, 62-63, 230, 232.  In his Affidavit, Doe states that the encounter was "traumatizing," that he felt "trapped," and that he is certain "the memory of that encounter will never go away."  <u>See</u> Doe Aff. ¶ 11. Doe summarizes his emotional harm as follows:

> Relationships with many of my friends and family have deteriorated or basically gone away.  I have anxiety that people will continue to send me links to the Facebook post and that anyone I try to get close to or date will not trust me, or it will at least be in the back of their mind.  From the comments on the social media posts, and from seeing news stories and tropes from TV shows or movies, I am fearful my safety is at risk due to people having the wrong idea about me.

<u>See</u> <u>id.</u> ¶ 14.

"Under Florida law, 'severe emotional distress means emotional distress of such a substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it.'"  <u>See</u> <u>Colon</u>, 2024 WL 3898011, at *9 (quoting <u>Kim v. Jung Hyun Chang</u>, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018)).  It is Doe's burden to show "'both the existence of emotional distress and the quality of that emotional distress such that a factfinder may reasonably infer both that the distress in fact happened and that the quality of that distress was too much for a reasonable person to be expected to bear.'"  <u>See</u> <u>id.</u> (quoting <u>Kim</u>, 249 So. 3d at 1306).   "'[T]he intensity and the duration of the distress are factors to be considered in determining its severity.'"  <u>See</u> <u>Bezzaz v. Moore</u>, No. 6:21-cv-528-JA-DAB, 2022 WL 4290709, at *10 (M.D. Fla. Sept.

16, 2022) (quoting <u>Kim</u>, 249 So. 3d at 1305). "Outrageous conduct, standing alone, cannot prove severe emotional distress." <u>See</u> <u>Colon</u>, 2024 WL 3898011, at *9. Indeed, "significant feelings of fright, shame, worry, and humiliation— and others beside—occasioned by the acts of others" are not enough and merely "an unavoidable part of living in society." <u>See</u> <u>Kim</u>, 249 So. 3d at 1306. This "high standard for determining what kind of emotional distress is remediable in a claim for intentional infliction is necessary to prevent the tort from becoming a venue for litigation over every emotional injury." <u>Id.</u>

Here, the evidence shows that Doe is experiencing ongoing anxiety about his reputation and fear for his physical safety. <u>See</u> Doe Aff. ¶ 14. However, it is evident from Doe's Affidavit that his anxiety and fears stem from the allegedly defamatory information published about him on the Internet, the conduct which Doe maintains is <u>not</u> the basis of his IIED claim. <u>See</u> Response at 14, 28; <u>see also</u> Doe Aff. ¶ 14. The evidence of Doe's emotional distress from the less than seven-minute encounter at the house itself is sparse.[14]

The record shows that Doe experienced surprise and fear during the encounter, describes the event as "traumatizing," and is certain he will never forget it. But fear, even significant fear, is not enough. And Doe offers no

---

[14] In the Response, Doe identifies Schmutte's text messages threatening to further disseminate the video as part of his IIED claim as well. <u>See</u> Response at 28. However, Doe cites to no evidence of any emotional distress caused by those threats. <u>See</u> <u>id.</u> at 15-16, 28; <u>see also</u> Doe Aff. ¶ 12 (describing Schmutte's text messages without any reference to resulting emotional distress).

evidence concerning the intensity or duration of this distress.   Given the high standard applicable to claims for IIED, the Court finds that no reasonable juror could conclude on this record that Doe's distress is too much for a reasonable person to bear, particularly given the evidence that Doe has not sought the help of a medical professional or started taking any medication as a result of this trauma.   Compare Bostick v. McGuire, No. 6:15-cv-1533-Orl-37GJK, 2017 WL 897308, at *5 (M.D. Fla. Mar. 7, 2017) (finding insufficient evidence of severe distress where the only evidence was plaintiff's testimony that he was paranoid around police and does not go outside much) with Bezzaz, 2022 WL 4290709, at *11 (finding sufficient evidence of severe distress where plaintiff, although not regularly seeing a therapist or taking medication, testified about her depression, anxiety, panic attacks, difficulty sleeping, hair loss, and inability to work); see also Kim, 249 So. 3d at 1306-07.   Accordingly, the Court will grant summary judgment in Defendants' favor as to Doe's claim for intentional infliction of emotional distress.   See Andrews v. Marshall, 845 F. App'x 849, 857 (11th Cir. 2021) (affirming grant of summary judgment in part based on a lack of evidence that the conduct at issue caused severe emotional distress); Moore v. Pederson, 806 F.3d 1036, 1054 (11th Cir. 2015) (affirming grant of summary judgment where plaintiff failed to "point to any facts evidencing that he suffered severe emotional distress"); see also Rubio v. Lopez, 445 F. App'x

170, 175 (11th Cir. 2011); <u>Frias v. Demings</u>, 823 F. Supp. 2d 1279, 1289 (M.D. Fla. 2011).

### 4. Assault

Next, Defendants move for summary judgment as to Doe's claim for assault.   Under Florida law, "[a]n 'assault' is an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." <u>See</u> <u>Sullivan v. Atl. Fed. Sav. & Loan Ass'n</u>, 454 So. 2d 52, 54 (Fla. 4th DCA 1984).   An assault claim "must be premised upon an affirmative act—a threat to use force, or the actual exertion of force." <u>Id.</u>   Indeed, "[m]ere words or threats are not assault; they must be accompanied by acts or circumstances to put one in reasonable apprehension of <u>imminent</u> harmful or offensive contact to the person.'"   <u>See</u> <u>Henning v. Felty</u>, No. 6:15-cv-927-Orl-40DCI, 2017 WL 9398641, at *6 (M.D. Fla. June 28, 2017) (quoting <u>Newman v. Gehl Corp.</u>, 731 F. Supp. 1048, 1051 (M.D. Fla. 1990)) <u>adopted by</u> 2017 WL 3405646, at *3 (M.D. Fla. Aug. 9, 2017).

In the Motion, Defendants assert that no one with PCI verbally threatened Doe or raised a hand or fist to him.   <u>See</u> Motion at 23.   In addition, Defendants maintain that "nothing in the record shows Defendants gave the appearance or took any actions that would reasonably create a well-founded fear that any imminent harm would be inflicted on Plaintiff."   <u>See</u> <u>id.</u>   And

Defendants observe that Doe did not call the police during the encounter and waited four days to file a police report.  Id.  However, Defendants' arguments are unavailing in that they fail to view the facts in the light most favorable to Doe as the Court must at this stage in the proceedings.

Upon review of the videos of this encounter, and viewing the facts in the light most favorable to Doe, the Court is satisfied that a reasonable juror could conclude that the surrounding circumstances and Schmutte's acts put Doe in reasonable apprehension of imminent harmful contact.  See Di Preta v. Taylor, 675 F. App'x 880, 883 (11th Cir. 2017).  Specifically, late at night, Schmutte invited Doe to the house under false pretenses, confronted Doe by surprise, and when Doe moved to leave, followed closely behind him aggressively shouting expletives and insults.   Indeed, Schmutte screamed so closely in Doe's face that Doe felt his spit.   According to Doe, he felt threatened by Schmutte's behavior and was afraid that Schmutte would hit him.   See Doe Dep. at 62, 231-32; see also Doe Aff. ¶ 11.   Under these circumstances, the Court finds that whether Doe was afraid of imminent bodily harm and if so, the reasonableness of this apprehension, are questions for the jury.

### 5.  Civil Remedy for Cyber Crime

In Count V of the Amended Complaint, Doe asserts a claim pursuant to section 815.06 of the Florida Statutes.   See Amended Complaint ¶¶ 60-65. This statute addresses certain computer-related crimes.   See Fla. Stat. §

815.06(2).  Although criminal in nature, the statute "provides a civil remedy for compensatory damages against a person who has already been criminally convicted under the statute."  See Mortg. Now, Inc. v. Stone, No. 3:09cv80/MCR/MD, 2009 WL 4262877, at *6 (N.D. Fla. Nov. 24, 2009) (citing Fla. Stat. § 815.06(4)(a)); see also Harvey v. Seminole Cnty., Sheriff, No. 6:16-cv-56-Orl-41TBS, 2016 WL 922548, at *3 (M.D. Fla. Feb. 4, 2016) adopted by 2016 WL 916560, at *2 (M.D. Fla. Mar. 10, 2016).  Here, Doe presents no evidence that Schmutte or PCI have been criminally convicted under section 815.06.[15]  As such, Doe's civil claim necessarily fails and Defendants are entitled to summary judgment in their favor on Count V of the Amended Complaint.[16]

In light of the foregoing, the Court will grant the Motion as to Counts III and V, and otherwise deny the Motion.[17]  The case is set for a final pretrial

---

[15] Remarkably, although Defendants raise this argument in the Motion, see Motion at 24, Doe does not respond to it.  See Response at 29.  Given the plain language of the statute and Doe's failure to offer any argument on this point, the Court questions how Doe's counsel can represent, consistent with his obligations under Rule 11, that "[a]ll elements of this crime and resulting civil remedy are sufficiently established."  See id. at 29.

[16] Defendants also appear to request their attorneys' fees as the prevailing party on this claim.  See Motion at 24.  However, to seek attorneys' fees, Defendants must file an appropriate motion in accordance with the Court's Local Rules.  See Local Rule 7.01.

[17] The Court notes that in the Response, Doe "encourages" the Court to sua sponte enter summary judgment in his favor.  See Response at 30.  This request borders on the absurd.  If Doe believes he is entitled to summary judgment, it is incumbent upon Doe to move for such relief setting forth the law and the facts that support the request.  The Court declines to do the work of Doe's counsel.  Regardless, as is evident from the foregoing, the remaining claims present myriad disputes of fact which require resolution by a jury.

conference on September 23, 2024.  <u>See</u> Order (Doc. 112).  Because this case is proceeding to trial, the Court intends to revisit whether Doe should be permitted to litigate this case anonymously.  As the Magistrate Judge noted when she granted Doe's request, the analysis is subject to change at different stages in the litigation.  <u>See</u> Order (Doc. 60) at 9 n.2.  At the final pretrial conference, the parties should be prepared to address whether Doe's privacy rights continue to outweigh the public's legitimate and constitutionally protected interest in knowing the identity of the parties.[18]

Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 91) is **GRANTED, in part, and DENIED, in part.**

   A. The Motion is **GRANTED** to the extent Defendants seek summary judgment in their favor as to Counts III and V of the Amended Complaint.

   B. In all other respects, the Motion is **DENIED**.

---

[18] By separate notice, the Court intends to reschedule the final pretrial conference due to the need to address criminal matters on the morning of September 23rd.

2.  The Court defers entry of final judgment until after final resolution of

this case.

**DONE AND ORDERED** in Jacksonville, Florida this 28th day of

August, 2024.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record